IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF    )    Case No.
1345A 4th STREET, N.E.                        )
WASHINGTON, D.C. 20002                  )    UNDER SEAL

AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Lavinia A. Quigley, being duly sworn, hereby depose and state as follows:

**A.    Introduction**

1.    I am a Police Officer with the Metropolitan Police Department (MPD), in
Washington, D.C.  I have been a sworn officer with MPD since 1989.  My current rank is a
Detective, second grade, and I have been assigned to the Major Narcotic Branch of the Criminal
Investigations Division, or its predecessors, since August 1994.  Before this assignment, I worked
with the MPD Rapid Deployment Unit for four years, specializing in vice, narcotics, and gun-
recovery investigations.  Throughout my law enforcement career, I have attended classes, seminars,
and special training sessions on the manufacture, packaging, use, and distribution of controlled
substances, as well as the detection and apprehension of narcotics traffickers.

2.    I have served as an undercover officer buying illegal narcotics for six years and have
made more than 1000 undercover purchases of illicit drugs of all kinds, including cocaine powder,
crack cocaine, marijuana, and heroin.  Because of my experience, I am frequently called upon to
assist in federal narcotics investigations by making undercover purchases of illegal drugs for such
agencies as the Federal Bureau of Investigation (FBI), the Drug Enforcement Administration (DEA),
and the Bureau of Alcohol, Tobacco, and Firearms (ATF).  In the course of my police duties, I have
interviewed hundreds of persons arrested in Washington, D.C., Maryland, and Virginia engaged in

the illegal narcotics trade concerning their unlawful activities. Further, I have spent many hundreds of hours engaged in secret surveillance of persons involved in illegal narcotic activity. I also have participated in a number of long-term vice investigations that have resulted in prosecutions in federal and local courts in Washington, D.C. As a result, I often have testified in federal and local courts. I have also served as the affiant for more than 200 narcotics or firearm search warrants issued by judges of the Superior Court of the District of Columbia and the U.S. District Court for the District of Columbia.

       3.     This proposed search is one of several being conducted simultaneously to crack down on trafficking of counterfeit merchandise and theft of intellectual property. The facts set forth in this affidavit are based upon my own personal knowledge; knowledge obtained from other individuals, including law enforcement officers and industry representatives; my review or the review by other law enforcement officers of documents and of audio and video recordings of undercover law enforcement activities related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; consultations with technical experts both in law enforcement and industry; and information gained through my training and experience. Among the industry experts consulted during this investigation is Blazer Investigations whose private investigators have received extensive training from the manufacturers of trademarked goods, including Louis Vuitton, Gucci America, Inc, Burberry of England, Kate Spade, and Coach, in the recognition of counterfeit goods and who have experience assisting the FBI, United States Customs, and State and local police agencies in the detection of counterfeit goods. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the

2

course of this investigation.

4.    I make this affidavit in support of an application by the United States of America for the issuance of a warrant to search the premises located at 1345A 4th Street, NE., Washington, D.C., as more particularly described in Attachment A of this affidavit, hereby incorporated by reference, for the items described in Attachment B of this affidavit, hereby also incorporated by reference, which constitute evidence, contraband, fruits, or instrumentalities of violations of criminal conspiracy and counterfeit goods trafficking laws, namely, Title 18, United States Code, Sections 371 and 2320.

**B.    Background**

5.    In December 2004 the Spotsylvania County Sheriff's Office, in Spotsylvania, Virginia, executed search warrants on two locations suspected of trafficking in counterfeit products. Seized during execution of the search warrants was over $150,000 in retail value of counterfeit purses and wearing apparel.  During the search of one of the locations, business and financial records were uncovered linking the illegal Virginia based activity to a business located in the District of Columbia.   Subsequent follow up investigation conducted by Spotsylvania County Sheriff's Detectives and Detectives from the Virginia Attorney General's Financial Crime Intelligence Center further identified one of the District of Columbia based operations as GIFTS UNLIMITED located at 1345A 4th Street, NE, Washington D.C.  According to Virginia State Corporation Commission Records, the Directors of the company include Habibullah KARWAN and Shamim KARWAN, both of 5833 Pratt St. Alexandria Va, 22310.

6.    In January 2005 your affiant was contacted by Mr. Edward J. Doyle, Director of the Financial Crime Intelligence Center, Virginia Attorney General's Office, regarding the operation of

GIFTS UNLIMITED. Mr. Edward J. Doyle has been the Director of the Financial Crime Intelligence Center for the Office of the Attorney General of Virginia since June 2002. Mr. Doyle is also a sworn Auxiliary Deputy Sheriff with the rank of Detective with the Spotsylvania County Sheriff's Office. Prior to his current employment, Mr. Doyle was employed by the U.S. Department of the Treasury's Financial Crime Enforcement Network (FinCEN), the U.S. Central Intelligence Agency, the Illinois Department of Law Enforcement's Division of Criminal Investigation, and the Illinois Legislative Investigating Commission. He has over 35 years of experience in organized crime and drug related law enforcement and intelligence work; has participated in, conducted, and directly or indirectly supervised over 1,500 criminal investigations relating to money laundering; and has participated in over 15 counterfeit trademark cases.

7.      From January 2005 through the present, your affiant, along with Detective Doyle and other members of the Washington DC Metropolitan Police Department's Major Narcotics Unit, Major Case Squad, conducted an investigation relating to the sale of counterfeit products by GIFTS UNLIMITED in violation of Title 18, United States Code, Sections 371 and 2320. The investigation included interviews with two cooperating witnesses, surveillance of the premises, and undercover purchases from the business. Based upon this investigation, it is clear that the managers and employees of GIFTS UNLIMITED at 1345A 4th Street, NE, Washington D.C, are engaged in the commercial sale of counterfeit products to members of the public. Your affiant also believes the listed owners of GIFTS UNLIMITED are laundering the proceeds from the illegal sale of counterfeit products through local bank accounts.

**C.      Relevant Code Sections**

8.      Title 18, United States Code, Sections 371 and 2320 provide in pertinent part:

4

<u>Section 371</u>:

If two or more persons conspire ... to commit any offense against the United States ... and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

<u>Section 2320</u>:

**(a)**      Whoever intentionally traffics or attempts to traffic in goods or services and knowingly uses a counterfeit mark on or in connection with such goods or services shall, if an individual, be fined not more than $2,000,000 or imprisoned not more than 10 years, or both, and, if a person other than an individual, be fined not more than $5,000,000.

**(b)**      Upon a determination by a preponderance of the evidence that any articles in the possession of a defendant in a prosecution under this section bear counterfeit marks, the United States may obtain an order for the destruction of such articles.

**... (e)**   For the purposes of this section –
   **(1)**      the term "counterfeit mark" means –
      **(A)**      a spurious mark
         **(i)**      that is used in connection with trafficking in goods or services;
         **(ii)**      that is identical with, or substantially indistinguishable from, a mark registered for those goods or services on the principal register in the United States Patent and Trademark Office and in use, whether or not the defendant knew such mark was so registered; and
         **(iii)**      the use of which is likely to cause confusion, to cause mistake, or to deceive. . . .
   **(2)**      the term "traffic" means transport, transfer, or otherwise dispose of, to another, as consideration for anything of value, or make or obtain control of with intent to so transport, transfer, or dispose of. . . .

**D.      The Investigation**

**1.      Cooperating Witnesses**

9.      Your affiant and Detective Doyle interviewed two cooperating witnesses regarding the criminal activity conducted by GIFTS UNLIMITED, identified herein as CW-1 and CW-2. These interviews were conducted from December 2004 through May 2005.  The two cooperating witnesses are common law husband and wife, and they operated a kiosk located in a mall in

5

Spotsylvania, Virginia, selling counterfeit goods, some of which they purchased from GIFTS UNLIMITED, during the years 2003 and 2004.

10.    CW-1 has provided your affiant and Detective Doyle with information that has proven reliable on at least ten occasions and has never provided information to your affiant or anyone else associated with this investigation which has been found to be incorrect. As part of his/her cooperation with law enforcement, CW-1 has entered guilty pleas to two Virginia State misdemeanor offenses, trademark infringement and money laundering, and is awaiting sentencing. CW-1 has been involved in the distribution and sale of counterfeit products for the past two years and is familiar with the packaging and recognition of counterfeit products, particularly counterfeit handbags, belts and scarves. CW-2 has proven reliable in the past on at least five occasions and also has never provided information to your affiant or anyone else associated with this investigation which has been found to be incorrect. As part of his/her cooperation with law enforcement, CW-2 has entered guilty pleas to two Virginia State misdemeanor offenses, trademark infringement and money laundering, and is awaiting sentencing. CW-2 is also familiar with the packaging and recognition of counterfeit products, particularly counterfeit handbags, belts and scarves.

11.    During interviews conducted by your affiant and Detective Doyle, CW-1 admitted purchasing counterfeit products including counterfeit handbags from GIFTS UNLIMITED. Often these transactions would be made in cash, by check and by credit card. CW-1 noted that on each occasion, the CW would receive a receipt for the purchase. CW-2 admitted to similar purchases of counterfeit products, including counterfeit purses, belts, wallets, key cases, and scarves from GIFTS UNLIMITED. Again, these transactions were often in cash, by check and by credit card and CW-2 would normally receive a receipt for each purchase.

## 2. Undercover Purchases

12.    On April 25, 2005, your affiant and CW-1 proceeded to Gifts Unlimited located at 1345A 4th St. NE, Washington D.C. to purchase counterfeit handbags.  Upon arrival at the location, your affiant and CW-1 were met outside the business by a female employee of the business, known to CW-1 as "Emma."  Emma escorted your affiant and CW-1 into store where CW-1 met with HABIBULLAH KARWAN, whom CW-1 identified as the owner of the business.  CW-1 introduced your affiant to HABIBULLAH KARWAN as CW-1's partner.  Once inside the store, your affiant observed one counterfeit Louis Vuitton purse, and other counterfeit Coach, Prada, and Kate Spade purses, containing counterfeit trademarks, for sale.

13.    HABIBULLAH KARWAN said he was from Afghanistan where business enterprises are becoming very expensive.  HABIBULLAH KARWAN said he purchased his home in Virginia in 1982 for $133,000, adding that it was currently worth over $500,000.  HABIBULLAH KARWAN said he had recently purchased a second house as an investment in Brandywine, Maryland, adding he wants to sell the residence in one year for a $100,000 profit.

14.    According to Prince George's County Maryland property records, HABIBULLAH KARWAN and Shamim Karwan purchased a single family home on a 7,987 square foot lot located at 8119 Elora Lane, Brandywine Md, 20613, Assessor's Parcel Number 11-3488087 from NVR Inc. on May 10, 2005, for $356,050.

15.    CW-1 told HABIBULLAH KARWAN that CW-1 and your affiant wanted to purchase some Louis Vuitton purses.  It was understood that the request to purchase such purses referred to counterfeit Louis Vuitton purses, rather than authentic purses, because that is what Gifts Unlimited sells and that is what CW-1 had previously bought.  HABIBULLAH KARWAN replied

that he was not selling Louis Vuitton until after Mother's Day because he considered it to be "too dangerous" (apart from the lone counterfeit Louis Vuitton purse which your affiant observed upon entering the store). HABIBULLAH KARWAN said, "they catch you," implying that law enforcement efforts were active seizing counterfeit products prior to that date.

16.    HABIBULLAH KARWAN said he had "a lot" (interpreted to mean counterfeit products) but he did not keep them there (interpreted to mean his business location) anymore. HABIBULLAH KARWAN said he intended to bring his products back to the store several weeks after Mother's Day. HABIBULLAH KARWAN reiterated several times that after Mother's Day he could get your affiant anything she wanted and all she would have to do was call him in advance. HABIBULLAH KARWAN said he lost $20,000 in product in December 2004 when representatives from Louis Vuitton, Rolex, Burberry and Tommy Hilfiger, along with three DC FBI agents and a representative from the Commerce Department, raided his store. He said he was lucky he was not in Virginia where he could be fined, adding in DC they just took his merchandise. HABIBULLAH KARWAN noted that all too often people selling counterfeit Louis Vuitton are linked as supporters of Al Qu'eda. He said he did not want to be on television. HABIBULLAH KARWAN told your affiant and CW-1 that they could order any brand from him and that he would supply them with what they want. HABIBULLAH KARWAN also bemoaned that one of his customers who is a street vendor of counterfeit goods lost all his merchandise in a seizure by police and industry representatives. HABIBULLAH KARWAN said the price for counterfeit Louis Vuitton was down but that Gucci was selling very good. He said he was trying to open another store with 7,000 square feet of space.

17.    According to Blazer Investigations, industry representatives enforced a civil seizure

8

order on HABIBULLAH KARWAN and his Gifts Unlimited store located at 1345A 4th St. NE, Washington D.C., in both June and December 2004, during which time counterfeit Louis Vuitton and Burberry goods were seized.

18.    "Emma" then assisted your affiant and CW-1 in selecting for purchase counterfeit handbags and wallets which your affiant stated were intended for resale at a "purse party." Emma also told your affiant that they had Gucci and Coach, meaning counterfeit Gucci and Coach, scarves for sale.    Your affiant asked if HABIBULLAH KARWAN had any "Burberry" purses. HABIBULLAH KARWAN displayed a counterfeit purse for your affiant but your affiant said she wanted the name on it. HABIBULLAH KARWAN said he could affix a Burberry sticker (trademark logo) on it for your affiant. HABIBULLAH KARWAN told your affiant that he could deliver Fendi and Louis Vuitton, meaning counterfeits, to your affiant the next day, but it would be dangerous.

19.    Your affiant purchased approximately ten (10) counterfeit handbags and two (2) counterfeit scarfs, each bearing counterfeit reproductions of federally registered trademarks of Coach, Prada, Gucci, Louis Vuitton, or Kate Spade. In exchange, your affiant paid HABIBULLAH KARWAN $164. After the purchase, CW-1 asked your affiant if she had Vani bags at home. CW-1 then asked HABIBULLAH KARWAN if he had Prada stickers. HABIBULLAH KARWAN said, "OK, I get some for you," at which time HABIBULLAH KARWAN exited the store. Det. Doyle, who was conducting a surveillance on the target location, observed a balding, heavy set, white male, wearing a blue shirt and blue jeans, subsequently identified as HABIBULLAH KARWAN, exit the entrance of Gifts Unlimited, 1345A 4th St. NE, Washington D.C. HABIBULLAH KARWAN proceeded to the driver's side door of a vehicle, a gold 2003 Toyota Four Runner, Virginia license plate number JGG4832, Vehicle Identification Number JTEBU14R030018025, and entered it. He

remained in the vehicle for about 45 seconds and appeared to reach under the front seat. He then returned to the store, carrying something in his hand. Upon re-entering the store, HABIBULLAH KARWAN gave CW-1 a bag containing ten (10) counterfeit Prada trademark logos or "stickers" which he said cost $10. Your affiant paid HABIBULLAH KARWAN for the counterfeit logos.

20.    All items purchased during this undercover visit were later inspected by a private investigator from Blazer Investigations and found to bear counterfeit marks, that is, spurious marks which are identical with, or substantially indistinguishable from, marks that are registered for those goods on the principal register in the United States Patent and Trademark Office and are in use, pursuant to Title 18, United States Code, Section 2320.

21.    On November 2, 2005, your affiant proceeded to GIFTS UNLIMITED, located at 1345A 4th Street, NE, Washington, D.C., to verify that HABIBULLAH KARWAN and GIFTS UNLIMITED were still trafficking in counterfeit goods in that location. Once inside GIFTS UNLIMITED, your affiant met HABIBULLAH KARWAN and discussed with him purchasing counterfeit handbags. Your affiant asked HABIBULLAH KARWAN whether he had any Louis Vuitton pocket books, and HABIBULLAH KARWAN replied that he did. HABIBULLAH KARWAN displayed to your affiant Chloe and Gucci handbags which appeared to your affiant to bear counterfeit marks. Your affiant told HABIBULLAH KARWAN that your affiant would purchase four of the Gucci bags. HABIBULLAH KARWAN then went to his vehicle, the gold 2003 Toyota Four Runner, Virginia license plate number JGG4832, Vehicle Identification Number JTEBU14R030018025, and retrieved numerous Louis Vuitton handbags bearing what appeared to be counterfeit trademarks. HABIBULLAH KARWAN displayed the Louis Vuitton bags to your affiant who selected ten for purchase. Your affiant informed HABIBULLAH KARWAN that your

affiant wanted to purchase more bags the next Thursday for a "purse party," where counterfeit goods are sold, to be held the following week. HABIBULLAH KARWAN informed your affiant that he keeps the Louis Vuitton hanbags in his vehicle. In total, your affiant purchased ten Louis Vuitton handbags; two Coach handbags; one Prada handbag; five Louis Vuitton scarfs and hats; four Gucci handbags; three Fendi wallets; four Louis Vuitton wallets; and one Chloe handbag. Your affiant paid HABIBULLAH KARWAN $482 in MPD funds for the items and received a receipt from HABIBULLAH KARWAN. All items purchased during this undercover visit were later inspected by a private investigator from Blazer Investigations and found to bear counterfeit marks, that is, spurious marks which are identical with, or substantially indistinguishable from, marks that are registered for those goods on the principal register in the United States Patent and Trademark Office and are in use, pursuant to Title 18, United States Code, Section 2320.

### E.    Evidence, Contraband, Fruits and Instrumentalities of Crime

22.    Based upon your affiant's training and experience, upon my participation in investigations of other illegal enterprises engaged in violations of narcotics laws, IRS laws, the Money Laundering Control Act, and related offenses, and upon the training and experience of other investigators participating in this investigation, including, but not limited to, that of Detective Edward Doyle, I know that:

a.    It is common for individuals involved in financial crime, including trafficking in counterfeit goods offenses, to maintain financial documents and records relating to both their personal and business financial affairs. These documents will show their acquisition, conversion, movement, secreting, transfer, and disbursement of currency, currency equivalents, and illegal goods, including counterfeit goods. It is also common for such persons to maintain currency, checks, money

orders, credit cards, credit card receipts, or other financial instruments which are the proceeds or facilitating property of the illegal activity. These documents, records, and financial instruments are often retained for long periods of time in secure and accessible locations, including residences, businesses, vehicles, safe deposit boxes, banks, and storage facilities;

       b.     In the case of an illegal business enterprise like GIFTS UNLIMITED, such financial documents and records often include inventory ledgers; purchase orders; confirmation letters; correspondence with co-conspirators; payment or disbursement ledgers; computer documents and/or files; invoices; employee lists and employment information; employee sales records; supplier and delivery records; receipts relating to illegal sales and to the expenditure of proceeds of illegal activities; U.S. Postal Service and/or next day carrier services documents and receipts; supplier, customer and/or co-conspirator telephone number and address listings; customer records; contracts; rolodex files; photographs and other forms of identification of associates and co-conspirators; appointment books; notes; airline ticket receipts; records of money orders; bank accounts; and financial instruments. All of the foregoing items and information constitute evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 371 and 2320.

       c.     Individuals involved in financial crime, including trafficking in counterfeit goods, create such documents, records, and information by various means, including, but not limited to, computers, printers, telex machines, facsimile machines, currency counting machines, pagers (digital display beepers), and telephones, telephone answering machines, and cameras. These individuals also maintain such documents, records, and information in various forms, including, but not limited to, electrical, magnetic, photographic, and tangible form. The warrant application therefore requests authorization to search for and seize all of the foregoing items of evidence in

whatever form and by whatever means they may have been created or stored, including any electrical, electronic, or magnetic form (such as any information on an electronic or magnetic storage device, including hard drives, floppy diskettes, ZIP discs, CD-ROMs, optical discs, backup tapes, printer buffers, smart cards, memory calculators, pagers, personal digital assistants such as Palm Pilot computers, as well as printouts or readouts from any magnetic storage device); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies).

23.    Your affiant also knows that computer hardware and software, and digitally, electronically, and magnetically stored files and information may be important to a criminal investigation in two distinct ways: (1) the objects themselves may be contraband, evidence, instrumentalities, or fruits of crime, and/or (2) the objects may be used as storage devices that contain contraband, evidence, instrumentalities, or fruits of crime in the form of electronic data. Rule 41 of the Federal Rules of Criminal Procedure permits the government to search for and seize computer hardware and software, and digitally, electronically, and magnetically stored files and information that are evidence of crime, contraband, instrumentalities of crime, or fruits of crime. In this case, the warrant application requests permission to search and seize all computer hardware and software, and digitally, electronically, and magnetically stored files and information on the premises of GIFTS UNLIMITED that constitute or may be contraband, and that constitute or may be evidence, instrumentalities, or fruits of violations, by GIFTS UNLIMITED and its owners or agents, of counterfeiting offenses involving Title 18, United States Code, Sections 371 and 2320. Based on all of the foregoing facts, your affiant believes that, in this case, computer hardware and

software, and digitally, electronically, and magnetically stored files and information on the premises of GIFTS UNLIMITED constitute evidence, instrumentalities, or fruits of crime.

24.    Individuals involved in the sale of counterfeit products, such as CDs, DVDs, watches, handbags, luggage and other wearing apparel and commodities often sell their product from stores rented by them or from kiosks located in suburban shopping malls.  Often times, they have the counterfeit goods shipped to their residence via commercial shippers and then remove the merchandise from the original shipping boxes and containers and transport it to their place of business where it is sold on the open market.  Individuals involved in the sale of counterfeit products often hide and safeguard contraband by storing their inventory in residences and storage facilities located away from their primary business.  Records pertaining to the rental and lease of storage facilities used to hide and disguise contraband; records concerning the ordering, purchase, shipment, storage, inventory, payment and sale of counterfeit goods and apparel; records and documents reflecting the identity of co-conspirators and associates; and computer hardware and software, and computer storage devices, used to generate and store such records are frequently located at such individuals' residences where they are considered safe from theft, damage or discovery. Furthermore, individuals involved in the sale of counterfeit products often update and enter business data into their computers during after-work hours in the privacy of their residence, and they often conduct business transactions, including sending and receiving faxes, sending and receiving email or other forms of communication regarding the purchase, transportation or sale of counterfeit products from their residences after normal business hours due to the differences in world times zones with overseas suppliers, contacts and criminal associates.

25.    Individuals involved in the sale of counterfeit products commonly engage in tax

14

evasion.  Frequently business owners will maintain two sets of books, one recording all cash sales for their own information and one recording redacted cash sales figures.  These monthly ledger sheets are often provided to bookkeepers and accountants who prepare quarterly sales tax payments on behalf of the business.  Records detailing true sales figures are seldom kept at the business location.  Rather, they are usually kept in office or computer areas in the business owners' residence.

26.    Individuals involved in the sale of counterfeit products commonly deal in large amounts of cash, much of which must be held in order to structure bank deposits under $10,000.  Often this surplus cash is kept in the business owner's residence rather than in an office safe in an unprotected store over night.  Individuals involved in financial crime also often use various money laundering schemes to dispose of their criminal proceeds and to facilitate their crimes.  They frequently co-mingle legitimate funds with illegitimate funds in an attempt to conceal and disguise their sources of income and they sometimes use a "nominee" or "straw purchaser" to purchase assets.

27.    The aforementioned facts provide evidence of probable cause to believe that the commercial retail distributor identified as GIFTS UNLIMITED, located at 1345A 4th Street, NE., Washington, D.C., and its owners and agents, including but not limited to Habibullah Karwan and Shamim Karwan, have conspired to traffic and have intentionally trafficked in goods while knowingly using a counterfeit mark on or in connection with such goods, in violation of Title 18, United States Code, Sections 371 and 2320.  Additionally, there is probable cause to believe that evidence, instrumentalities, contraband, and fruits of those violations, as described above and more particularly described in Attachment B, will be found inside the premises of GIFTS UNLIMITED, located at 1345A 4th Street, NE., Washington, D.C., more particularly described in Attachment A.

28.    Based upon my knowledge, training, and experience, as well as information related

to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices. I also know that during the search of the premises it is rarely possible to complete on-site examination of computer equipment and storage devices for a number of reasons, including the following:

a.      Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is rarely possible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

b.      The best practices for analysis of computer systems and storage media rely on rigorous procedures designed to maintain the integrity of the evidence and to recover "hidden," mislabeled, deceptively-named, erased, compressed, encrypted, or password-protected data while reducing the likelihood of inadvertent or intentional loss or modification of data. A controlled environment, such as a law enforcement laboratory, is typically required to conduct such an analysis properly.

c.      The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. The hard drives commonly included in mere desktop computers are capable of storing millions of pages of text. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files are evidence

16

or instrumentalities of crime.  This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

29.    In light of these concerns, your affiant hereby requests the Court's permission to seize the computer hardware, and associated peripherals as discussed below, that are believed to contain some or all of the contraband, evidence, instrumentalities or fruits of crime described in the warrant and to conduct an off-site search of the hardware for such contraband, evidence, instrumentalities or fruits of crime if, upon arriving at the scene, the Agents executing the search conclude that it would be impractical to search the computer hardware on-site.

30.    Based upon my knowledge, training, and experience, as well as information related to me by agents and others involved in forensic examination of computers, I am aware that searches and seizures of evidence from computers taken from the premises commonly require agents to seize most or all of a computer system's input/output and peripheral devices, in order for a qualified computer expert accurately to retrieve the system's data in a laboratory or other controlled environment.  Therefore, in those instances where computers are removed from the premises, in order fully to retrieve data from a computer system, investigators must seize all the storage devices, as well as the central processing units (CPUs), and applicable keyboards and monitors which are an integral part of the processing unit.  If, after inspecting the input/output devices, system software, and pertinent computer-related documentation, it becomes apparent that these items are no longer necessary to retrieve and preserve the data evidence, and are not otherwise seizeable, such materials and/or equipment will be returned within a reasonable time.

F.    **Analysis of Electronic Data**

31.    The analysis of electronically stored data, whether performed on-site or in a laboratory or other controlled environment, may entail any or all of several different techniques.  Such techniques may include, but shall not be limited to, surveying various file directories and the individual files that they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer capable of containing pertinent files, in order to locate the evidence authorized for seizure by the warrant); examining all the structured, unstructured, deleted, and overwritten data on a particular piece of media; opening or reading the first few pages of such files in order to determine their precise contents; scanning storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic key-word  searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

### G.    Conclusion

32.    Based on the information set forth above, the undersigned affiant submits that there is probable cause to believe that evidence, contraband, fruits, and instrumentalities relating to violations of Title 18, United States Code, Sections 371 and 2320 are located and will be found within the premises at 1345A 4th Street, NE., Washington, D.C.


_____
Detective Lavinia A. Quigley
Washington, D.C., Metropolitan Police
  Department



Sworn to before me and subscribed in my presence this ____ day of November 2005.



_____
United States Magistrate Judge
District of Columbia

**ATTACHMENT A**
**Premises to be searched**

GIFTS UNLIMITED, 1345A 4th Street, NE., Washington, D.C., is described as a commercial retail establishment located in a  brick structure with a sign above the entrance containing a blue background and gold and white lettering, the gold lettering reading, "GIFTS UNLIMITED, INC. 1345-A 4th ST. NE, WASHINGTON , DC 20002.  Tel. 202-546-5631  Fax. 202-546-5632."

## ATTACHMENT B
### Items to be seized

Items to be seized are the evidence, fruits, instrumentalities, or contraband relating to violations of Title 18, United States Code, Sections 371 and 2320, including but not limited to the following:

A.    <u>RECORDS</u>

1.    Records, documents, and materials containing information of past and present criminal activity involving trafficking or conspiring to traffic in goods while using a counterfeit mark on or in connection with such goods. The terms "records," "documents," and "materials" includes such items in all forms, including paper, photographic, mechanical, electronic, magnetic, and optical forms, or other coding forms on computer media or on media capable of being read by a computer or computer-related equipment, such as fixed hard discs, external hard discs, removable hard discs, floppy diskettes, compact discs (CDs), digital video discs (DVDs), tapes, optical storage devices, laser discs, electronic notebooks, zip disks, printer buffers, smart cards, or other memory storage devices.

2.    Records, documents, and materials that relate to the business of GIFTS UNLIMITED, to trafficking in counterfeit goods, or to Habibullah Karwan and Shamim Karwan and that contain, constitute or concern inventory ledgers; purchase orders; confirmation letters; correspondence with co-conspirators; payment or disbursement ledgers; computer documents and/or files; invoices; employee lists and employment information; employee sales records; supplier and delivery records; receipts relating to illegal sales and to the expenditure of proceeds of illegal activities; U.S. Postal Service and/or next day carrier services documents and receipts; real estate and storage facility lease and title documents; supplier, customer and/or co-conspirator telephone or fax number and address listings; customer records; contracts; rolodex files; keys; photographs and other forms of identification of associates and co-conspirators; appointment books; notes; and airline ticket receipts.

3.    Records, documents, and materials containing, constituting or concerning financial transactions, financial statements, and financial summaries; including bank statements; financial instruments; financial applications; wire transfer records; credit cards; credit card statements and records; ATM access cards; credit reports; social security cards; accounting records; money orders; checks; tax records; ledgers; and journals.

4.    Records, documents, and materials that relate to the business of GIFTS UNLIMITED, to trafficking in counterfeit goods, or to Habibullah Karwan and Shamim Karwan and that contain, constitute or concern identification, foreign or domestic travel, or occupancy, residency, and ownership, such as driver's licenses; passports; visas; airline tickets; social security documents; mail; utility records; telephone records; and mortgages, deeds, and lien records.

B.    <u>HARDWARE</u>

5.    Computer hardware, which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes any data-processing devices (such as central processing units, memory typewriters, Personal Data Assistants (PDAs), and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, removable magnetic disk storage drives and disks, tape drives and tapes, optical storage devices, transistor-like binary devices, and other memory storage devices); peripheral input/output devices

(such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, cables and connections, and RAM or ROM units,); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

C.    SOFTWARE

6.    Computer software consisting of digital information which can be interpreted by a computer and any of its related components to direct the way they work; in whatever form it may be found, to include: electronic, magnetic, optical, or other digital form, in addition to printed source code.  Software includes, but is not limited to: any programs to run operating systems, control peripheral equipment, applications, utilities, scripts, compilers, interpreters, and communications programs; any programs, whether functional or not, to assist in the defeat of security/protective feature in place to prevent the unauthorized copying, distribution, and/or activation of software; along with any and all programs necessary for the proper functioning of this software.

D.    PASSWORDS, DATA SECURITY DEVICES, AND COMPUTER DOCUMENTATION

7.    Computer passwords and other data security devices that are designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software or digital codes may include programming code that creates "test" keys or "hot" keys, which perform user-defined security-related functions when activated.  Data security software or code which might also encrypt, compress, hide or "booby-trap" protected data to make it inaccessible or unreadable as well as reverse the process to restore the data.  Computer passwords may be stored in electronic media or written down on ledgers, books, papers, etc.

8.    Computer-related documentation consisting of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use the computer hardware, software, or other related items.

E.    COUNTERFEIT GOODS AND RELATED EQUIPMENT, DEVICES AND MATERIALS

9.    All apparel or other items, including but not limited to purses, handbags, wallets, belts, scarfs, glasses, or hats that bear, or that appear to be possessed with the intent to affix, counterfeit marks; any unaffixed marks such as labels, logos, or identifying containers, documentation or packaging; and any tools, equipment, devices or materials for use in the manufacture, preparation, creation, or distribution of counterfeit goods or counterfeit marks.